Good morning, your honors. Ian Huchain for Planets of the Palace. Your honors, I won't repeat what's in my briefs, but what I want to do is highlight what I think are the critical components of this appeal. First of all, the standard of review. This is summary judgment. No, I'm going to hear my question. No, no, I didn't mean that. In order to understand where we are here in general, my understanding is that you're not challenging. Is that right? Yes, yes, that's right. What we are challenging is the district court's misapplication of the standard of review in the summary judgment appeal, which I hope this court doesn't follow suit. That's a critical standard of review, and a critical component of this appeal is obviously we have a video of the incident. The video is just like, if not better than, an eyewitness to the incident. So we don't just have the officer's testimony. We don't have a victim that's been deceased. We do have a neighbor that saw some things. But really the critical thing is now we have a video that shows what happened, and a jury is entitled and must view that video in order to determine this fall for the community defense. What is genuinely disputed on the video that we all agree you can watch that and see, the individual has got the gun up in the air, and he's turning. What is genuinely disputed about that? Well, the genuine dispute of where his arm was and what he was doing. You can see in the video. Yes. He raises the gun. And there are police officers in the direction of the gun that he raises. So where is the genuine dispute? Well, first of all, the genuine dispute is what did that mean to the officers, because the critical issue is the officer's state of mind, correct? Yeah, the critical issue is whether their belief that the gun, that he was pointing the gun at them, any of them, in a threatening manner. So has he pointed at him? Is that your position, that the fact that he raises it in their direction is not enough? It must be pointed at them for them to engage in the force being engaged. Yes, that's correct. And that's what the officers testified. That Mr. Gonzales aimed in various places. Aimed at the officers. He pointed at the officers. Obviously, when they're saying that, that shows the suspect, or they reasonably believe. Well, what if they thought there was about to be a gun, he was lifting it, so they thought he was about to aim it at them. I'm sorry, that he wasn't lifting it. I mean, there is a case, we'll see if I'm not remembering it, basically says you don't have to actually aim it, but if there's a gesture where you think he's going to aim it or a threat or something. Yes. I mean, so why is the fact that he's lifting his arm sufficient for them to say, oh, he's about to start aiming it at us? Well, because, again, the jury is the prior fact that's supposed to draw the inferences from. But they're supposed to be doing that. I mean, they're not going to get inside the head of these. It's the question whether it's objective they thought. Objective, yes. Objective. Objective, of course. Objectively, because you would think that if somebody's raising their, has a gun in their hand, there's been a whole lot of threats against policemen. Yes. Can they not see the policemen? Is that true? Can you see the policemen? Can you not see them? No. In fact, I was going to say. Well, there's something to this testimony. I mean, you can't really tell that from the tape, can you? Well, no, no, not from the video. But there's, I think it's undisputed that he's a very good police. Pardon me? He's a really good police. Well, he just, first of all, let's just talk about him in a second before he comes out of the garage. He obviously doesn't think anyone's around because he's just casually walking out of the garage. At some point, he is startled by something. And that's consistent with a demand, put down your gun? Well, that's what the officer said. You can't tell. I think the video's not clear on that one. Is there any dispute, is there any genuine dispute that the officer said that? Well, I think by watching the video, you can't really tell. The video has no audio. There's no audio, that's correct. But there's inconsistencies in the officer's testimony that I think in trial we should be able to explore. What inconsistencies? Well, as to the timing of command. Some of the officers said we are in a hurry of command. Some of the officers said the command was after. Well, my question is about whether he could have said it at the time that he said he said it, given how very fast everything happened. It's also the fact that he's startled. A jury could infer that he's startled by just hearing something, whether it's a command or not. But my point is that these dozen or so officers, this is a surprise situation. The suspect doesn't know. I thought that there was at least some evidence, and that's what the contrary, I don't think, that by the point that he was shot, he was beyond these screens. And this one guy stepped out, so he could see the policeman. At least one of them. That's all speculation because how do you know if the suspect is dead? Well, I said there's evidence. Is there evidence that he could have seen them? Yes. There is some people who testified that he could or did see them. Well, if they're testifying as to what he saw, then yes. Well, they were in his line of sight. I thought somebody said that he had eye contact. I think the evidence is undisputed that they were behind bushes. But anyway, I understand. Yes. But at what point did he raise his arm? Well, this all happened so fast. Obviously, when you look at the video, and I think this is why the jury has to see the video, because the video, any rational juror, that's all we need. The problem is that the video doesn't deal with his question we're discussing now. Right. How did he place him? How could he see them? Well, no, the question really is were the officers, or their police, that they were threatened by the raising of his arm? Because I think that's the only thing they say they felt threatened by. It wasn't his sudden movement, but it was the fact that his arm came up. Right. So, and what we try to say is that anybody watching the video, or a rational person watching the video, will see that as he's turning, he's simply trying to get help back to the garage for his safety. As he's startled, they're lying in wait. It's an ambush. It's not a situation where you have officers in plain view, and they're all approaching each other. But there is evidence that warnings were given, indeed, by an independent witness. It's all evidence. And that she heard warnings, and that she heard shouting. We cannot contradict that because we don't have those. There is no genuine dispute about it. It's not just to the warnings, but here's the point of the warnings. Everything is split. The question is what does a suspect do that would reasonably cause the officers, and you say that as a metaphor. What I found with this case is that there's a lot of background here. I mean, the fact is that he was threatening to shoot policemen. He was. So, does that factor into their judgment about whether he was about to shoot them? Well, no, I mean, I think that does. I think that does go to the feeling that they are threatening because he's making those threats. And their judgment, their objective judgment as to whether or what he raised his arm, he might be thinking that. Yes, I think so in the circumstances of this case, I want to focus again on the actual incident at the time of the shooting. These officers, again, were at work undercover. They agreed it was a covert operation. Their objective was to contain this man because they thought it was suicidal, homicidal. He's made threats, but obviously he's distrustful. So, look, we don't even want to arrest him. He hasn't done anything yet that we know of that we should arrest him. Well, he's making threats that were probably himself. Well, but they said themselves that they weren't seeking to arrest him at that time. They wanted to contain the situation. So, in containing the situation, they parked themselves undercover, which is fine. I totally understand why they would do that. No reason to dispute him why that would be reasonable in that situation. I mean, my understanding is that part of your argument is, I mean, we're now under California law, not under federal law. And under California law, we can go further back in terms of judging whether there was negligence here. Yes. And so we should take into account the whole episode and whether there was so it's your contention that they never actually tried to contact him or, I mean, apparently the people on site were supposed to communicate with him and talk him down, but they never did. And may those arguments go out where you repeat them on appeal, but I just wanted to focus today on the minimum aspect of the case because I do think that that is the critical difference between this case and many other case shooting cases. And the only thing I want to say about the leading up to is that I agree with your honors that this was a very tense and bad situation, and that's what set the stage for this covert operation where they were taking cover. So the question of whether they felt or could or believed that they felt immediately threatened was a reasonable one, which is the crux of the issue. If, again, they were held open and this man had a gun and he started to raise it or made a sudden movement and they were undetected, it was a much different situation than when you're surrounding and then the situation where they're undercover, it's a surprise ambush situation almost. I mean, they don't intend to shoot him at that time, but when they're trying to contain him undercover, you've got to, I'm sure, to train him, because this could make him run into a trouble, but training in that kind of situation, I think, for just four years is contained. He then walked out, and he decided to walk out. He told the police he was going to walk, and he and his companions who were hiding next to the house with him, and he was going to go out and confront him, and he walked out, and in a few ways it was physical, is my understanding, and said, drop his gun. That's not at all clear from the record. I'm sorry. Is that what he said? He said he was going to get radioed, I think, by some of the other officers. He was going to confront him. And he said, I walked out. Well, I don't know if he said walked out. I think he just said he was going to confront him, and then it happened. And, again, our suspect, our deceived, is startled by this whole thing that happens in a second, and to me it's not as a matter of logic there, but I believe a rational juror looking at the video could draw the inference. If that's all that we have, that's enough. Draw the inference that he suddenly turned not to. If you look at it carefully, I don't think a juror would look at it very carefully. I'm sure the court did, too, because he's moving his hands. He's almost lit. He's just trying to turn to get back to the garage. He's not, in any way, pointing the gun like he's throwing a fire, which is what you witnessed next door in his deposition. He said, and I think there's not a point in anything he tells you, what pointing the gun means. Yes. Well, I believe that's a question of the fact that the jury, given all the circumstances, not only including the threats that led up to it, but the fact they were undercover, the fact that they were just trying to contain, and the fact that this was a startling situation. I don't think, I think, you know, obviously you're not using deadly force if somebody's retreating into their house. So the officers had to say, and they did say, that we saw him point a gun at us, and that's their testimony. So I believe the video is their evidence that a jury should be able to see, and not just decided by the court. But a jury can see this and say, no, I'm going to challenge the officer's testimony. And I think that's the crux of our case, and I'd like to reserve that. I mean, unless you have other questions. Do I think that that's what the officers testified to? Yes. Well, I think they say that it was pointed at them, and I believe that that's a testimony that I don't think is laid out or corroborated by the video. I think the video challenges that. Therefore, yes, there is a difference between pointing a gun as if it's fired, and simply raising the gun in the direction, waving the gun, or, you know, a move to leave somewhere, to retreat back to a house. I just think that a jury is entitled to draw the difference. It's not the only difference that can be drawn here that the district court drew. I'm not sure. It's not a matter of law. It's not a matter of law, Your Honor. That's our appeal. Obviously, the district court disagreed, and we respect that, and we respect the court's opinion. But, again, the juries are entitled to decide these issues. These are critical issues. The parties in the community... Yes, sir. Yes, sir. Good morning, Your Honors. May it please the court, my name is Nathaly Blackmount. I represent the city of Indiana. I'm the defendant. In this case, counsel for the plaintiff said that the video is better than an eyewitness. That's essentially what this case comes down to. We see it on the video. I think Your Honors have seen it, that there was not an unnatural movement of this gentleman who came outside unannounced with a gun in his hand when he turned towards the garage. There was a very unnatural movement when his hand, instead, was starting by his side when he moved towards the garage.  we're moving the gun by his side. Well, I mean, to be honest, it looks to me perfectly possible that he was simply doing like this with his arms as he was turning around. And it was just in a momentum of turning and he didn't specifically raise the gun. Right? So I didn't stare at the thing forever, but it certainly seemed like somebody could fix it. So the question is, does that lead to the jury question I could think of the jury thinking, is that what matters? Or instead, is your position whether or not he was pointing the gun? It doesn't matter. Essentially, it doesn't matter where the gun ends up. Your Honor, once he fails to abide by the commands and maintains the gun, and his right arm starts moving, yes, in this case, it was even more threatening towards officers because the gun indeed came up and around and we've shown in some of the PDFs, SCR-332 through 381. And you want to notice that all his background, his right arm background, might be different story. Correct. And we look at this from the perspective of the officers in those positions only yards away from this gentleman. We don't look at it from the perspective 4,000 feet up from the CHP airplane. Well, the officers testified that he was actually pointing the gun at them. Yes, there's... Hold on, hold on. Your Honor, maybe it would have been enough for him not to have pointed the gun, but he does that, and he was pointing the gun. Yes. And to your challenge, that he was not pointing the gun at them. But if he was pointing his gun at them, would that have been a request to the science division to order the jury and the officers to testify? I don't believe so, Your Honor, because as the case law is clear, if the person's armed, a furtive movement, a harrowing gesture, those type of things can lead to lawful disenforcement. Okay. But had the officers testified that he was in a state of concern and pointed the gun at them, is that a sufficient request? But if the officers didn't, if they were alive at the time of the shooting, if they were alive at the time that he was pointing the gun at them, would that have been considered a request to the jury? It's possible in the court's hypothetical that if he had his arm moved and it moved in an upwards direction and maintained that and he was shot, potentially that could be a factual issue or a legal issue for the jury to determine. But in this case, I think the jury could reasonably think that he didn't point the gun. He left it at him. In some ambiguous search, does that make a difference? If they didn't point it at him because the police claimed that he didn't point the gun because they thought, oh, no, he looked like he didn't point the gun, although he certainly raised it, is that relevant at all to the conclusion of the case? Not in this situation. We're talking about split-second decisions from the perspective of these officers. As the court's well aware, these officers are given some leeway in these types of cases. Well, that's the fact that he was turning, I mean, he was clearly running away from them because he was pointing the gun, right? Correct. So could the jury say, well, all of these instances are because he was running away, but he was clearly running away. Why were they shooting him when he was running away? They shot him and held him, right? Those were two shots in the back. Because in this situation, Your Honor, we have the video, and we proved conclusively where the gun was essentially being pointed. Wasn't it... Is it correct, based on the record, that he made that movement and raised his arms, that there were officers in the line of that movement at that time? Yes. Are there any records that point that? Yes, Your Honor. We've shown there's several PDFs that are in the record, including S.E.R. 341, 340 and 341, but specifically 341, our expert, did an overlay to show the driveway from an overhead view from the CHP plane, sort of merge those together. Officers were right in that vicinity, right by the uncovered vehicle. Essentially, the gun would have been aimed very close to them, if not at them. And these officers... One of the questions the court had was, did officers come out? Was he able to see them? Yes, at some point, when he first came out, these officers realized that he was looking around. He could essentially see them. So at that point, they had to make themselves known. They started giving commands, and some of them did have to come out somewhat. I don't remember any of that. I remember there's this one guy, Fortner... Correct. ...saying, I'm going to challenge him, and saying, I thought he did say, I stepped out a little bit. That's correct. I don't remember anybody else saying that he came out. I don't remember any specific other instance that he could see them. Could you clarify that? Yes. Miles, how about you? Yes. Fortner certainly was the one who exposed himself. Whether other officers did or not, I'm not sure of. Well, you certainly said you were. You said emphatically that they came out, but they didn't. Well, they started to deploy in such a way so they could get into a good position to challenge this gentleman. But certainly, Fortner, the evidence is clear, was outside. What is the evidence that he could see them while they were behind, whenever they were behind? Well, that's what the officers believed because of the close proximity and the fact that officers had to have some sort of vision. They believed, it's in the record, that they were to be seen by this individual once he came out and started looking around. So at that point, the option was to give him commands. And there was also... Yeah, I was wondering if I could go right in. There was a CHP-fixed claim that capturing him was a good thing. It looked like he was looking out for something else. He may have. And he may have been looking around. But one of the points that counsel made was that this gentleman came out, and he got startled, and he was ambushed. But the analysis is from the perspective of the officers. So whether or not this gentleman was startled by the fact that police were in close proximity or not is not determinative. And frankly, the analysis is from the perspective of officers. So that's not so serious. I'm sorry. We are now under California law only. There's no qualified immediate question, right? Is there no qualified immediate California law? Or something like it? I thought it was discretionary immunity, essentially. But that's not before us now. So I gather that the difference that makes is that we can take, we can go beyond a minute of the impact in terms of whether there was negligence as to the whole situation. Correct, Your Honor. I understand. It does sound like negligence. No. Knowing everything we know, and their own 10 was not dangerous to die, then they end up ambushing him. Well, unfortunately, this gentleman came out of the garage unannounced and did have a firearm in his hand. And all that is undisputed. But I thought the point was to get there and talk him down, not to ambush him in Starland. That's correct, Your Honor. But they were there for 45 minutes. So why didn't they do that? It takes a lot of time to get these kind of resources to a scene like this. And it's in the record. We've had patrol officers taking positions and had to be switched with other more advanced squad officers. But it's well before this happened, right? Well before he came out of the garage. Is there any record of how long before? No. I mean, essentially, Sergeant Morefield says he was on scene for about 45 minutes. And during that time, they're contacting citizens to get out of the area, shelter in place, bringing resources in, and have to methodically have a covert approach to the house in case this gentleman is at their neighbor's house on the roof and is going to ambush officers. So is there anything they hadn't done? Anything they hadn't done? He said generally they weren't done. But I can't tell what it was they weren't done with. Well, it's not necessarily in this record, but there was potentially they were going to bring in a large armored vehicle to the scene in case that needed to be used to get a hostage out. It was unknown if there was anybody else in the house with this gentleman, Mr. Gonzalez. There may have been another victim bleeding inside the house, but certainly they were trying to mobilize. They were in the process of mobilizing at the time this gentleman came outside. And they didn't cause him to come out. In other words, they didn't call to him and cause the situation of his coming out with the gun. That's correct. We were sort of trying to buy time, and that's why we were not contacting this gentleman to try to provoke him. There was some testimony, some evidence in the record, some arguments from counsel about why didn't we tell this gentleman the police were there, you know, that sort of thing. That likely would have created factual issues provoking the situation. These officers essentially were mobilizing, and they had hostage negotiators on scene that were prepared for a long potential negotiation. Everybody wanted this to end peacefully, and it was Mr. Gonzalez who provoked the situation. Yes, we do look at the pre-shooting conduct under Hays, but I don't believe there's any evidence here of any factual dispute as to whether or not any of the pre-shooting conduct was reasonable or not. In addition, Hays says that law enforcement officers have a degree of discretion as to how they choose to address a particular situation, and there's no particular pre-shooting protocol that's necessary. I read about the kill card declaration. It's represented that it was not admitted to the medicine, so actually it was not only not admitted, it's the first two sites that were admitted, right? My understanding from the order is that the court considered it sort of alternatively what I believe to sustain our objections to the extent of the whole declaration. To the extent of what? The whole declaration, Maya. I didn't understand that to be the case. In the evidentiary ruling, this court order says that the city objects to sub-basic personal knowledge, et cetera, et cetera, and finds this declaration conclusory and highly speculative. It fails to support its conclusion with any compresentations to admissible evidence in the record. He sustains the city's objections to that extent. What does that mean? It requires the other testimony, and the other one, she says, more generally, that the objections were sustained, so I thought there was a difference. It might not be fully clear from the record, but even as you look at any of those statements from those declarations, it's based on pure speculation. For example, experts find to opine about the timing of the gunshots, who fired first. There's no way from this record without video of officers firing, some sort of audio, some sort of ballistic recreation for any of these experts, including a police procedures expert, to opine about the timing or the sequence of the shooting. Sure, because my understanding is he was a sort of engineering expert. He was supposed to be testifying about a statistical matter, what could this man have been doing throughout records and time, is that what he was doing? He was trying to explain the body movements we see from Mr. Gonzales when he comes out of the garage, but a lot of that is totally immaterial. What his legs are doing and his upper body is doing is material, and Mr. Kalkar sort of concedes that in his declaration at one point that there was a noticeable movement with the right arm, which was the arm with the gun in it, so even then it's considered, and that's exactly what we see in the video evidence as well. Gordon, any other questions? Yes, Your Honor. There was seven fiery officers, so we're looking at approximately 17. That's fairly far away. Correct, but there were officers across the street that were firing, so they were some distance away, and we have a gentleman who is moving swiftly away from them as well. So I don't believe the number of shots is material. When you said he was moving quickly, I think you said that he was moving fairly quickly, but I'm not sure if he was moving swiftly. Well, he was moving quickly. That's why on the real-time video, the arm movement is almost impossible by the naked eye to see because it's such a quick movement. But that's the only relevant one. I mean, I don't understand what the relevance of the stop time is because the officers weren't seeing him at stop time. Well, it's because we can't see from this vantage point 4,000 feet up in real-time what the officers are seeing in close proximity. Based on their trained eye, I think it is very important, and frankly, the crux of the case. With that, let's see if anybody has further questions. Thank you. Thank you very much. We're still good for three minutes. We're good. Does anybody have time for a few stuff? Can I ask my last question? I'm sorry to interrupt. I just want to make this really quick. What is the Farmer's Day Center on the various years of service? I don't know. I didn't. All right. Go ahead. Well, I'm sorry. I just don't know if I actually taught the organization. Well, again, this all happened so fast. And the thing about the commands, I know that that's considered a corporate command. I don't know if you said that. But if you look at the video again, it doesn't sound so conceded, and you have to concede. It didn't happen. It did happen. It's just that he turned and ran immediately. It has to do with the fact that he's startled by something, whether it's a command or a sound, it doesn't matter, because as soon as anything is done, he runs away. Well, again, you had to suggest that it was not possible to make them, especially as far as you said, in the time before he turned. That's right. I mean, that's right. Maybe he started talking, but then as soon as he heard a sound, he turned and ran, and then he shot. So, you know, I just think that video raises as many questions as it does answers probably more. And, again, real-time is the only critical one. And as it comes to concede, it's almost impossible to tell where it's ended. The point about that, which is the one thing we're looking at, was real-time from the blue sky, rather than real-time from the ground where the officers were. That's right. So, clarifying, you might at least clarify what the officers actually saw. Clarifying officer. Yes. That's right. Again, as far as the difference between just having the gun in a direction and pointing it with the barrel, I know that's a split second, but if you watch the video again, when he turns, he's not even gripping the gun like he's going to shoot. It's kind of hanging in, like he just pulled it out of his pocket. He's running away. So that's not even the gun pointing. So if somebody waves a gun like this in the barrel, I realize that this gesture, it's a question of still, is it threatening reasonably objectively to the officer that they've used it before. And finally, just the last point I wanted to say was it was a long wait, but it wasn't as if he just all of a sudden walked out the door. They were, oh, we didn't know he was going to walk out the door because we couldn't record. Apparently, he was opening the garage door up and down at least several times before he actually came out. He was playing loud music from his car in the garage. They heard the sound of glass shattering and concrete or something like that. So there was a lot of indication that there was something going to happen, so they were on the alert for him to come out. And, unfortunately, this happened so fast. I think he did, and also when he called back, I don't think he answered the phone because it doesn't sound like that. Right. Right. Well, there's a lot of things we raised. I have a comment too today. They're all there, but I think, again, I didn't feel the appeal rises and falls on this video, and I'm very sure we got it. Thank you. Thank you.
judges: Reinhardt, Berzon, Amon